The opinion of the court was delivered by
Blanchard, J.
The Oity of Monroe, situated upon the Ouachita river, desired a traffic bridge across that stream.
Being a navigable waterway of the United States it was necessary 16-obtain authority from Congress to bridge the river.
As the municipal limits of the town extended only to the middle of the stream, and the Parish of Ouachita had jurisdiction over the opposite shore, it was thought advisable to obtain the grant of authority from Congress in the name of the city and the parish.
Accordingly an act, bearing the title “An Act to authorize the Mayor and Oity Council of Monroe, and the Police Jury of OuachitaParish, La., to construct a bridge across the Ouachita river at Monroe”, was passed.
It granted permission to the City and Parish to construct the bridge- and am'ong other things provided! it should be located and built under and subject to such regulations for the security of the navigation of the river as the Secretary of War shall prescribe, and in order to secure this it required that the grantees should submit to that official, for his *2133 examination and approvál, the design and drawings of the proposed bridge, together with a map showing its location, the topography of the banks of the river in the vicinity thereof, the shore lines, the direction and strength of the current, the bed of the-river obtained from soundings, and such other information as might be required for a full and satisfactory understanding of the subject.
And it forbade the commencement of the work of construction until the location and plan of the bridge shall have been approved by the •Secretary of War.
In June 1897 the City of Monroe advertised for proposals for the construction of the bridge. The Malyor, who was also Chairman of the Bridge Committee, was to receive the bids, and the limit of time fixed for their reception was July 10th, afterwards extended to July 24th. It was required of each bidder to forward his certified check for $2500, which, it was stated, “shall be forfeited in case the party receiving the award fails to sign the contract within ten days from the time the award is made.”
The sub and superstructures of the bridge were to be constructed according to plans on file in the Mayor’s office.
Plaintiff company, on July 2, 1897, wired the Mayor to forward it full information regarding the bridge to be let and a copy of the plans on file.
The Mayor complied by sending printed instructions and information, and referred plaintiff to the City Engineer for official copies of the plans, drawings and specifications.
Plaintiff applied to the City Engineer for the latter and what purported to be official copies of the same were sent. Upon receipt thereof the company compiled estimates for the bridge and followed this by submitting a proposal to construct it for $49,933, payable in ten equal annual installments. It accompanied its bid with the required check -for $2500.
On July 26, 1897, the Mayor wired the company its bid was accepted, .-and the latter replied asking that the contract be mailed immediately for examination. Being advised that the contract could not be drawn until a representative of the company was sent to Monroe, one was dispatched.
He raised various objections, which, after much negotiation and con- ' sumption of time, failed of adjustment, and culminated, in the early part of October, in the declination on the part of the plaintiff company to execute a ‘contract predicated on the bid they had submitted.
*2134 Following this, defendant proceeded to collect, the amount of the certified- check and -placed the proceeds thereof in its general fund. This was without the knowledge or consent of plaintiff’, who, ascertaining that the City was again inviting bids for the same bridge, demanded the return of its cheek. It had- then already been collected by defendant and the latter made no reply.
, Later the City let a contract for the construction of the bridge to the Groton Bridge Company at the -price of -$88,000.
This suit is to recover the amount of the check so collected as. aforesaid.
One of the grounds upon which recovery is sought is that the City of Monroe, -in- attempting to make a contract with the plaintiff for a bridge over the Ouachita river, was acting ultra viresj that the legal right- or authority to undertake such work was not within its grant of corporate powers; and that the principal contract, or attempted contract, being void, the accessory thereto — the check drawn to insure its execution — being in the nature of a penal clause to inforce its performance, is likewise void, since the nullity of the-principal obligation involves that of the accessory. . • ■
Another ground is that at the time of the award of the contract to-plaintiff and the demand made upon it to sign the written instrument purporting to evidence the same, the City of Monroe had not secured the approval of the Secretary of War to the plans of the bridge as required by the act of Congress, and, therefore, the said City was not, itself, in a position to contract.
A third ground is that plaintiff’s bid was predicted upon certain plans and specifications (or copies thereof) sent to it, whereas the contract offered in response to - such bid was based upon other and materially different plans and specifications.
These grounds of action are elaborated in an original and amended petition.
The defense is that plaintiff is estopped from denying the City’s right or authority to make the contract, or to construct the bridge, for the reason that the company had recognized the right, authority and capacity of the Mayor and Town Council by submitting a bid and offering to construct the bridge, and on the further ground that the alleged 'incapacity and want of authority were not urged as a reason for plaintiff’s refusal to sign and execute the contract.
It is denied that the plans and specifications forwarded to plaintiff *2135 differed from those on file in the Mayor’s office, and it is averred that if any differences existed plaintiff was amply protected under its bid and by the terms of the plans and specifications, because of the fact that .the latter required plaintiff, in addition to their offer to do the work for a lump sum, to submit unit prices covering the prices of material, etc,, to meet changes that might be made during the progress ci the work, either for increase or reduction of quantity of work and character of materials used, and that plaintiff complied with this requirement by submitting such unit prices to meet such changes, etc.
It is denied that the plans for the superstructure of the bridge had not been approved by 'the Secretary of War when plaintiff’s agent came to. Monroe, and it is averred that the plans for both the superstructure and substructure had been approved by the War Department as early as the 2nd of July, 1897, which was previous to the time plaintiff was required to execute the contract. '' ’
These defenses aré elaborated in the answer filed and the City’s action, in enforcing- the penal clause of the contract by the collection of the $2500 cheek is sought tó be justified.
There was‘also filed, in bar of the demand for the'return' of that sum, the plea of prescription of one year.
Judgment below was in favor of defendant and this appeal followed.
In -the view wé take of the ease it is not found necessary to pass upon the question whether or not there was legal authority or capacity in the City of Monroe to contract for the Construction of a bridge across thd'Ouachita river.
Neither do we find it necessary to discuss or pass upon the question whether or not plaintiff is entitled to relief because of the alleged difference between the plans and specifications sent to- it and upon which its bid was predicated, and those on file in the Mayor’s office upon which the contract plaintiff was required to sign, was based.
We think-the case is with the plaintiff upon the other ground declared on, viz: — that at the time the bid was accepted and plaintiff’s representative came to Monroe for the purpose, of executing the formal contract for the construction of the bridge, the City of Monroe had not put itself in position to contract by securing- the final approval of the Secretary of War to the full plans for the proposed work, as required by the Act of Congress.
We find that it was not until the 18th of September, 1897, that the final plans for the work to be done in the Ouachita river, in connection *2136 with this bridge, were approved by the War Department, and that it was not until the 26th of September that the same was notified to plaintiff company.
This was two months after the acceptance by the City of plaintiff’s, bid for the construction of the bridge.
During these two months the water in the river was at a low stage, and it was the time when the work in the river and on its shores, in connection with the bridge could be done to the best advantage and at a cost greatly under what it could be done for when the river was up.
Plaintiff’s proposal for the bridge was upon a close margin and at a low price. When the Secretary of War finally approved the plans it was nearing the time -when the fall rains might be expected to set in, to be followed by a rise in the river and a full stage of water, during the Winter and Spring. These conditions were such as to greatly augment the price of the work and it was not reasonably to be expected that plaintiff would consent to be held to a proposal predicated upon a low stage of water, when, through no fault of its, the other party to the proposed business arrangement was not in a condition to contract legally until the greater part of the low-water season had passed.
Again, it is shown that during the two months aforesaid, culminating' in the final approval by the Secretary of War of the plans for the work, the prices of steel, required for the bridge, had largely increased over what they were when the bid of the plaintiff was accepted, and this constituted a material alteration in conditions entitling plaintiff to relief against the enforcement of the proposal it had submitted.
It also appears that after plaintiff’s bid was accepted and during the two months aforesaid, and for a considerable period of time following the date when the Secretary of War acted finally in the matter of the approval of the plans, yellow fever appeared and was prevalent in parts of the States of Louisiana and Mississippi, and a great scare in consequence thereof was upon the country, rigid quarantine regulations were adopted and enforced by cities and towns, including the City of Monroe, and by these means travel and traffic were retarded, transportation by rail and water impeded and an almost general stoppage of business and of prosecution of works of improvement and construction ensued. It is in evidence that owing to the fear of yellow fever it was impossible to secure men competent to do the bridge work to go to Monroe for the purpose.
In view of these circumstances, all post-dating the acceptance of *2137 the plaintiff’s bid and culminating before the City of Monroe was in a position to contract with reference to the bridge by reason of not having secured the final approval of the plans therefor by the Secretary of War, it cannot be expected that plaintiff could be held to the execution of the contract when on the 26th of September the Mayor of the City wired the company that “additional plans to the bridge have been received and approved by the Secretary of War. We are ready to sign contract. Let me hear from you.”
We do not agree with the ruling of the trial Judge excluding the evidence offered by plaintiff showing that the plans for the whole work to be done on and in the river in connection with the construction' of the bridge had not been approved by the Secretary of War. The reason for this ruling was irrelevancy and inadmissibility under the pleadings.
The letters, document and other evidence showing the want of full .and final approval of the plans by the Secretary of War at the time plaintiff’s bid was accepted and the contract tendered, were brought us by means of bills of exception seasonably taken to the adverse ruling, .and in this way the testimony is before us.
We think the same should have been received by the trial court. The petition makes the averment that the City was not in a position to •contract because it had not secured the approval of the War Department to the plans of the superstructure of the bridge.
Defendant-insists that the approval of the plans both for the super.structure and substructure had been secured before the submission of plaintiff’s proposal, and as showing this, refers to the action of the War Department taken on July 2, 1897.
Reference to this shows that the City of Monroe had submitted to •the Secretary of War for his examination and approval a design and •drawings and map of the location of the bridge in question, and that the 'Secretary of War had approved the same, but subject to conditions as follows: — “That the space from the rest pier above the Vicksburg, "Shreveport and Pacific Railroad bridge to the rest pier below this proposed bridge, on a line with the pivot pier of both, shall be inclosed by continuous crib-work, or other timber structure, extending above the 'line of highest water.”
“That, if deemed necessary by the Secretary of War, guide work •shall be built on either or both sides of the channel immediately above ¡and through the draws of said bridges; plans for which shall be sub *2138 mitted to and receive the approval of the Secretary of-*War before the superstructure of the proposed bridge is commenced.” .
This, then, was not a full and final approval of the plans for the bridge. Action of the War Department was favorable to the plans as far as submitted, but required other work to be done not shown by the plans submitted, and stipulated that this other work, called crib-work or protection work, must be done and that plans for same should be made and submitted for approval, and approved before the superstructure of the bridge was commenced. It is clear, then, that tiherd had been no such approval of the plans for the superstructure of the bridge by the War Department, prior to the acceptance of plaintiff’s bid, as authorized work to be commenced upon it. That it was probaSble, in due time, the plans for the further work required to be done in the river would be approved, cannot be admitted to have the effect of taking the case out. of the category of the City’s unpreparedness to contract at the time it signified its acceptance of plaintiff’s proposal.
Nor is this counteracted by the fact that the further and additional work required by the War Department to be done as set forth in its; conditional approval of the plans for the bridge submitted by the City, was not to be done by plaintiff — was not covered by its bid, nor to be-included in its contract. This -additional work was required to be done by the City — the builder of the bridge — and plans for it were to be-submitted and approved before the superstructure of the bridge could', even be commenced.
So that pilaintiff, in the allegation of its petition 'that defendant was not in a position to ’contract because not having secured the approval of the War Department for the erection of the superstructure, covered the case sufficiently to admit at{l legal evidence of the fact alleged.
Defendant had not secured the approval of the Department for the erection of the superstructure. What is pointed to as showing this; approval expressly forbade the erection of the superstructure, or its; commencement, until other and further plans for other and further work in the river in connection with the bridge, had been submitted and' approved.
Plaintiff was in ignorance of the fact that the War Department had not fully and finally acted when it submitted its bidt This being-so, it was not estopped to raise this objection to signing the contract when it añade the discovery, and we think the objection was seasonably-raised.
*2139 It follows from the foregoing that as the City of Monroe was not. itself ready to contract, it was not in the position to enforce a penalty against the plaintiff for not contracting. The exacting of tifie $2500 check from the plaintiff when its bid was submitted was in the nature of a penal clanse intended to enforce ai principal obligation.
A penal clause is defined by the Code (Art. 2117) to be a secondary obligation, entered into for the purpose of enforcing the performance-of a primary obligation. See also C. C. 2118.
It is considered' by the laiv in the nature of compensation for the; damages which the creditor sustains by the non-execution of the principal obligation. C. C. 2125.
But the penalty being stipulated merely to enforce the performance; of the principal obligation, it is not incurred, although the principal obligation be not performed, if there be a lawful excuse for its nonperformance. C. C. 2120; 22 La. Ann. 150; 36 La. Ann. 690; 13 La. Ann. 476; 35 La. Ann. 1182.
We have seen that plaintiff did have a lawful excuse for its nonperformance. It follows that the penalty was not incurred and defendant cannot retain the money it collected oñ the cheek deposited with, it.
Nor is the right to recover the same barred by the prescription of one-year. 37 La. Ann. 492; 30 La. Ann. 607.
Eor the foregoing reasons, it is ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed, and it is now adjudged that the defendant, the City of Monroe, holds in its;, possession Two Thousand Five Hundred Dollars belonging to the-plaintiff company, and it is decreed that said plaintiff do have and’ recover of the defendant the said sum of Twq Thousand Eive Hundred-Dollars, with legal interest from judicial demand, and that the costs-of both courts be taxed against the defendant.
Rehearing refused.